REGAN, Judge.
Plaintiff, Irma Cavalier, a passenger, instituted this suit against the defendants, Joseph Taylor, the owner and operator of a taxicab bearing the trade name of Elk Cab and his insurer, Nola Cabs, Inc., endeavoring to recover the sum of $61,369, representing personal injuries and other expenses incidental thereto, incurred on September 18, 1954, at 10:05 P.M., when the operator of the taxicab negligently drove into a depression in Apricot Street resulting in the injury to plaintiff’s back which is the special subject matter of this litigation.
Defendants answered and generally denied the allegations of plaintiff’s petition and then asserted that the operator of the taxicab carried plaintiff safely to her destination and that if plaintiff sustained any injury it did not occur while she was a passenger in the taxicab.
This cause was tried before a jury and predicated on their verdict a judgment was rendered in favor of plaintiff for $2,400 against both defendants jointly and in solido. From this judgment, both defendants have prosecuted this appeal.
Plaintiff has answered the appeal requesting that the award be increased to $5,000 and that the expert fees of the two doctors called by plaintiff be fixed at the sum of $100.00 each.
There were only two witnesses who possessed knowledge of this accident, namely, the plaintiff and the defendant taxicab driver, Joseph Taylor.
On the night of September 18, 1954, at about 10:05 P.M., the defendant, Joseph Taylor, the owner and operator of the taxicab, called for the plaintiff at her home in 9135 Apricot Street in the City of New .Orleans. The cab was insured or bonded by the defendant, Nola Cab Company and it was stipulated that the plaintiff was a passenger for hire. In the unimproved street adjacent to the residence 9135 Apricot Street, there existed a large hole or depression measuring 10 feet in length and inches in depth. The record does not reveal the width of the hole, except through the medium of a photograph thereof.
The plaintiff entered the cab and informed the operator that her destination was 2600 St. Louis Street. Shortly after the cab was set in motion, both the front and the back wheels struck the hole causing the plaintiff’s body to be thrown forward and then backward, resulting in the alleged injury to the lumbo-sacral region of her spine.
The operator of the taxicab asserted that he was travelling only one mile per hour when the front and rear wheels of the cab were driven into the depression. However, despite the slow movement of the cab, he was unable or made no effort to stop after his front wheels struck the hole.
After the occurrence of the foregoing incident, the plaintiff changed her destination from 2600 St. Louis Street to 9134 Forshey Street which is the home of her sister. She stated that she decided to change her destination because of the pain that she experienced in her back shortly after the mishap occurred.
When she arrived at her sister’s home, she complained of pain and in an effort to provide relief, her sister offered her aspirin and suggested that she rest her back. Approximately forty-five minutes after the plaintiff arrived there and no relief had been obtained by the use of improvised remedies, the plaintiff requested that her sister call the same cab and its operator to drive her to the Charity Hospital.
After her admittance into that hospital, an official thereof decided that she should *104 be referred to Flint-Goodridge Hospital, where her injuries were diagnosed by Dr. Frederick Rhodes as lumbo-sacral sprain. He prescribed rest, heat and massage with external analgesics. This was the only time that he examined and prescribed for plaintiff’s injuries. She was released from this hospital on the night after the accident.
Despite rest and home treatment, the pain in the lower part of plaintiff’s back persisted and she then consulted Dr. William Quinn for the purpose of having her back x-rayed and treated. She was seen by this physician on September 22, 27, October 4 and 11, 1954. There is some dispute as to why she terminated the professional services of Dr. Quinn. She asserts that both his attitude and the results of his treatment were so unsatisfactory that she never visited him again after October 11, 1954.
Defendant, on the other hand, asserted that she had “trouble with Dr. Quinn” and, therefore, the inference, which defendants desired to create, was that Dr. Quinn was of the opinion that the plaintiff had fully recovered from her injuries without residual disability.
In any event, several days later she consulted Dr. L. J. Gehbauer, who diagnosed her injuries as a fairly severe sacro-iliac sprain accompanied by spasms of the lower lumbar muscle.
From October 13 to December 4, 1954, the plaintiff visited this physician on nineteen occasions. On her initial visit, he prescribed a surgical type belt to strengthen and support her sacro-iliac muscles, and seventeen months after the accident she asserted that she was still wearing this belt.
Dr. Gehbauer administered numerous diathermy treatments to plaintiff and also prescribed medication for relief of pain; he also instructed her to apply heat to her back, to sleep on a hard mattress and to avoid strenuous forms of body exercise. In conclusion he testified that the plaintiff had informed him voluntarily that she had been treated by Dr. Quinn, who told her “that she didn’t have much wrong with her back and that the X-rays were negative.”
On October 25, 1954, the defendants had the plaintiff examined by Dr. George D. B. Berkett, a specialist in orthopedics. He testified that from the history given to him by the patient, that she complained of pain first in the. left buttocks and later on in the right buttocks, and that she formerly had been a patient of Dr. Quinn, who had treated her for her injuries before she terminated their professional relationship. Dr. Berkett stated that he gave her the Lasegue and the Patrick tests and that he could find nothing wrong with her back. In conclusion he asserted :
“It was my opinion that the physical examination revealed no evidence of pathology in the low back region to account for this patient’s complaints. The difference in the circumference of both calves is not attributable to the accident described. It was my opinion that this patient has fully recovered, without residual disability.”
The only questions which the foregoing pleadings and the evidence have posed for our consideration are ones of fact and that is, whether the accident occurred and if so, what were the extent of plaintiff’s injuries emanating therefrom.
A comprehensive analysis of the evidence convinces us that the accident was proved not only by the testimony of the plaintiff but by the defendant as well.
An examination of a photograph which appears in the record, reflecting the situs of the accident, shows that the particular condition of Apricot Street created a sufficient hazard to vehicles adventurously operating therein so as to cause such an accident as occurred herein.
In his deposition, the defendant driver testified that when he struck the hole, his cab bounced twice, that is, initially, when the front wheels and then subsequently, *105 when the back wheels struck the depression. Therefore, he could hardly deny that, at least, an accident occurred on the night of September 18, 1954. He laboriously asserted in this deposition that he was moving only one mile per hour when he struck' the hole.
It taxes our credulity to accept this latter statement as true because, at this speed, we do not believe that any unusual motion of the cab would have occurred, and therefore, the jury was fully justified in disregarding this phase of his testimony.
We believe that the proximate cause of the accident was both the failure of the operator of the taxicab to maintain a proper lookout, and the excessive speed at which the cab was moving in a street which obviously dictated that a vehicle entering therein should only move slowly and cautiously.
 It is too well settled to need citation in support thereof, that a carrier is required to exercise the highest degree of care, vigilance and caution for the safety of those it undertakes to transport and is liable for the slightest negligence. The burden of proof was, therefore, on the operator' of the taxicab to prove that he was free of fault, which he has failed to do, consequently, the operator and his insurer must respond in damages to the plaintiff for even the slightest injury resulting from the accident.
Defendants’ counsel argues that since plaintiff failed to call Dr. Quinn, who was one of the physicians that had treated her for her alleged injuries, we should presume that had he testified his medical opinion would have been adverse to the interest of the plaintiff. Assuming arguendo that this was a fair inference to draw because of Dr. Quinn’s absence at the trial, we still believe that the whole evidential context of the record preponderates in favor of the fact that plaintiff was injured as a result of the accident.
The record clearly establishes as a fact that on the night of the accident the plaintiff suffered a lumbo-sacral sprain and that as a result thereof, she was hospitalized for one night and a day in the Flint-Good-ridge Hospital. Following her release from that institution, she was compelled, by virtue of the persistence of pain, to remain intermittently in bed, from September 27, 1954, to December 4, 1954. During this per-ion, she was treated by Dr. Gehbauer nineteen times. Thereafter, the injury necessitated the wearing of a sacro-iliac belt for a period in excess of seventeen months and during this time she was advised to treat herself at home with hot baths and other medication.
For the foregoing injuries, the jury awarded plaintiff the sum of $2,400, which we believe was excessive for the injury and that the award should, therefore, be reduced to the sum of $1,500.
On appeal, counsel for plaintiff has argued that she was entitled to recover individually, the sum of $289.93, representing wages which she was forced to expend to secure help in operating a grocery store while she was confined at home, for medicines, a sacro-iliac belt and the cost of hospitalization. It is conceded that the plaintiff was married and not judicially separated from her husband when the foregoing expenses were incurred, and when she instituted this suit.
It is axiomatic in our law, that in all suits for restitution of a community asset or debts due to the community, an action for the recovery thereof must be prosecuted by the husband as head and master of the community, and the wife cannot stand in judgment therefor. The vindication of community rights is vested alone in the husband. This doctrine is sustained not only by our codal law, the economic and social philosophy of which is sound, but by an unbroken and uniform line of decision.[1]
*106 Plaintiff’s counsel has also requested that we award expert fees of $100 each to Dr. Frederick Rhodes, the physician who administered to her in Flint-Goodridge Hospital on the night of the accident, and to Dr. L. J. Gehbauer, who subsequently treated the plaintiff.
We are of the opinion that when a doctor of medicine, who has previously been consulted by the patient for the purpose of diagnosis and treatment, subsequently testifies on behalf of the plaintiff, merely to relate a detailed account of his treatment as attending physician, he is not entitled to compensation as an expert witness in conformity with the provisions of law made and provided therefor.[2]
For reasons assigned, the judgment appealed from in favor of plaintiff, Irma Cavalier, and against the defendants, Joseph Taylor and Nola Cabs, Inc., jointly and in solido, is amended by reducing the amount thereof from $2,400 to the sum of $1,500, and as thus amended, it is affirmed.
Amended and affirmed.

. McDaniels v. Doll, La.App.1949, 40 So.2d 530; Prats v. Prats, La.App.1955, 77 So.2d 205.

. LSA-B..S. 13:3666 which reads: “Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to he fixed by the court, with reference to the value of the time employed and the degree of learning or skill required.”